IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LARRY E. FORDHAM, JR.,
          Petitioner,

v.                                            Case No.  3:04cv248/MCR/MD

JAMES R. MCDONOUGH,
          Respondent.

_____

### THIRD REPORT AND RECOMMENDATION

This cause is before the court upon remand from the District Judge with instructions "to consider the effect, if any, of the *House* [*v. Bell*, 126 S.Ct. 2064 (2006)] decision and the Schisler affidavit on petitioner's procedural actual innocence claim."  (Doc. 65, p. 3).  Because respondent had not been given an opportunity to address these new matters, the undersigned ordered supplemental briefing.  (Doc. 68).  Both parties have filed supplemental materials.  (Docs. 71 and 77).  After careful consideration, it is the opinion of the undersigned that the *House* decision and the Schisler affidavit do not change the ultimate conclusion of the Second Report and Recommendation (doc. 60):  that petitioner's amended habeas corpus petition (doc. 39) is untimely and should be dismissed.

With the exception of the discussion of petitioner's procedural actual innocence claim, the undersigned incorporates the Second Report and Recommendation (hereinafter "Second Report") into this Third Report and Recommendation as if fully set forth herein.  (*See* Doc. 60).  Accordingly, for the reasons stated in the Second Report, the undersigned again concludes that the amended petition is untimely and that there is no record basis for applying the doctrine of equitable tolling or another exception to the limitations period that might

excuse such untimeliness.  The Second Report's analysis of whether petitioner's "gateway claim" of actual innocence is sufficient to avoid the time bar is modified as set forth below.  For the reasons that follow, the undersigned concludes that even if the court assumes that an "actual innocence" exception to the limitations period exists, petitioner has not made a colorable showing of actual innocence under *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

<u>Standard Governing Procedural Actual Innocence Claims</u>

In *Schlup*, the Supreme Court set forth the standard of proof governing a habeas petitioner's procedural claim of actual innocence:  The petitioner must show that constitutional error "probably resulted" in the conviction of one who is actually innocent.  *Id.*, 513 U.S. at 324, 326-27, 115 S.Ct. at 865, 867.  A mere allegation of innocence is not enough; "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  *Schlup*, 513 U.S. at 324, 115 S.Ct. at 865.

The *Schlup* Court went on to make several observations about this standard. With respect to the term "probably resulted," the Court clarified that, "[t]o establish the requisite probability, the petitioner must show that it is <u>more likely than not</u> that no reasonable juror would have convicted him in light of the new evidence."  *Id.*, 513 U.S. at 327, 330, 115 S.Ct. at 867, 868-69 (emphasis added).  With respect to the term "reasonable juror," the Court instructed: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented.  It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt."  *Id.*, 513 U.S. at 329, 115 S.Ct. at 868.

In assessing the adequacy of the petitioner's showing, the district court "is not bound by the rules of admissibility that would govern at trial."  *Id.*  Instead, the court is allowed also to consider "the probative force of <u>relevant</u> evidence . . . 'including that alleged to have been illegally admitted (but with due regard to any

unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 328, 115 S.Ct. at 867 (emphasis added) (quoting Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)).  The Court also observed that when considering an actual innocence claim in the context of a request for an evidentiary hearing,

> the District Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial.  Obviously, the court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment.  Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.

*Schlup*, 513 U.S. at 331-32, 115 S.Ct. at 869.

In the recent decision of *House v. Bell*, __ U.S. __, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the Court did not alter the standard set forth in *Schlup*.  It reiterated that standard, emphasized certain features of it, and evaluated the evidence developed in House's federal habeas proceeding under that standard.  The Court did note, as a preliminary matter, that the parties in that case did not dispute that House had presented new <u>reliable</u> evidence.  *House*, 126 S.Ct. 2064, 2077 ("There is no dispute in this case that House has presented some new reliable evidence; the State has conceded as much." (citations to record omitted)).  In addition, because the district court in *House* held an evidentiary hearing, a decision the State did not challenge, the Court cautioned that it had no occasion to elaborate on *Schlup's* observation that the court may consider how certain factors bear on the probable reliability of the petitioner's evidence.  *House*, 126 S.Ct. at 2077.

<u>Application of *Schlup* Standard to Petitioner's Claim</u>

The petitioner in this case claims that he is innocent because he did not intentionally and knowingly participate in the armed robbery of Trout Auto Parts which resulted in Billy Wayne Coker's death.  In support of this claim, petitioner alleges that he has evidence that co-defendant James Patrick Bonifay is now "willing to publicly disavow" petitioner's knowing participation in the crime.  To support this

assertion, petitioner has submitted the affidavit of Escambia County Deputy Sheriff Lawrence Vieitez dated December 5, 2001.  The affidavit provides, in pertinent part, as follows:

> On or about the week of November 14, 2001 inmate [James] Patrick Bonifay was transferred from Union Correctional Institution to our facility at the Escambia County Jail to appear in Court.  I [Deputy Vieitez] had an opportunity to speak with inmate Bonifay while he was in our facility at the county jail.  He had asked me about the kids in the green jump suites [sic] who were on a tour of the jail.  I responded to him saying that thanks to your buddy inmate Fordham, that he started this tour and youth awareness program.  We spoke in depth of the program and how it works, and inmate Bonifay had asked how Fordham was doing.  I explained to him that he was doing fine and inmate Bonifay on his own accord, told me that in no way did Larry Fordham, Jr. have knowledge of why we pulled up to the Trout Auto Part Store the night Mr. Coker was killed and the store was robbed.  He stated to me that Fordham did not have knowledge of the robbery or murder that took place at the Trout Auto Part Store that night.  He also stated to me that Fordham was just a little spoiled rich boy and that is why I used him.  I asked Bonifay if he had ever told anyone else this and he answerd [sic] me with the answer no, that he had never told anyone else.  I then asked Bonifay if he would be willing to speak with Larry Fordham, Sr. [petitioner's father] and he replied yes, but he was to be here for a short time for re-modification and would be leaving in a few days going back to prison.

(Doc. 8, ex. BB, Vieitez Aff., p. 1).

Contrary to petitioner's assertion, this affidavit does <u>not</u> suggest that Bonifay is willing to testify to petitioner's innocence.  Nor has petitioner presented any other evidence that Bonifay would testify, much less that his testimony would exonerate petitioner.[1]  Notably, petitioner admits that both before and after Bonifay made this alleged statement to Deputy Vieitez, petitioner's father attempted to obtain an exculpatory statement from Bonifay, but such efforts were unsuccessful.  (Doc. 59, ex. C; doc. 63, p. 18 n. 11).  Petitioner further admits that Bonifay <u>has been unwilling to repeat or even confirm the statement he made to Deputy Vieitez</u>.  (*See* Doc. 63, p.

---

[1]Petitioner has not presented the court with a sworn statement from Bonifay himself attesting to petitioner's innocence and his willingness to so testify.  Nor has petitioner submitted any other evidence to support his contention that Bonifay will testify on the witness stand to petitioner's innocence.  The statements of Deputy Vieitez, Robin Archer, Sergeant Martin and Jennifer (Morris) Tatum do not support petitioner's contention that Bonifay will testify.

14 n. 9).  Thus, petitioner's current assertions that Bonifay will actually testify, and that his testimony will be as petitioner suggests, without any confirmation from Bonifay having been obtained during the intervening five years, are speculative at best.[2]

---

[2]Petitioner analogizes his case to *Kendrick v. State*, 708 So.2d 1011 (Fla. 4th Dist. Ct. App. 1998), *Benjamin v. State*, 793 So.2d 147 (Fla. 2nd Dist. Ct. App. 2001), and *Gomez v. State*, 363 So.2d 624 (Fla. 3rd Dist. Ct. App. 1978), cases in which Florida courts held under state law that the proffered evidence constituted "newly discovered evidence" of innocence warranting an evidentiary hearing. This case law is inapposite.  First, these are decisions of state, not federal courts.  Second, these cases concern evidentiary hearings in the context of Rule 3.850 motions, not federal habeas proceedings.  Third and most importantly, the evidence in this case is not of the kind at issue in the cited cases.

In *Kendrick*, defendant Larry Kendrick ("Larry") was found guilty by jury verdict of trafficking in cocaine.  Larry had been tried along with his co-defendant and cousin Ralph Kendrick ("Ralph"). Ralph's defense had been to shift all the blame to Larry.  Larry's newly discovered evidence consisted of Ralph's sworn testimony, given for the first time more than six years after their trial, that the cocaine was not Larry's, but Ralph's, and that he had lied in telling the police that it was Larry's.  *Id.*, at 1012.  Ralph further testified that Officer Brown, one of the officers who testified at trial, told him to say that he got the cocaine from Larry in order to keep his own prison time to a minimum.  The First DCA remanded the case for the trial court to hold an evidentiary hearing or for the attachment of additional record excerpts conclusively refuting Larry's newly discovered evidence claim.  The petitioner in the instant case does not have an affidavit or sworn testimony from co-defendant James Patrick Bonifay.

In *Benjamin*, the defendant was convicted after jury trial of aggravated child abuse and child neglect.  Approximately three years later, Benjamin alleged that the child's mother, Jamie Ashwell, had come forward and admitted to accidentally causing the injuries which formed the basis of the child abuse charge.  Benjamin supported his sworn allegation with a letter written by Ashwell stating that she caused the injuries and a letter written by Ashwell's sister stating that, at the time the injuries happened, Ashwell told her she had caused the injuries.  According to Ashwell's letter, Benjamin was not present when the injury occurred and she did not tell him about it.  *Id.*, at 148.

In *Gomez*, defendant Basilio Gomez, his brother Cecilio Gomez, and two other co-defendants were jointly charged with robbery.  Cecilio Gomez was tried first by a jury and acquitted.  Subsequent thereto, the defendant Basilio Gomez was tried non-jury before the trial court, found guilty as charged, and sentenced to 20 years imprisonment.  After his conviction, defendant Basilio Gomez filed a motion for post-conviction relief under Fla.R.Crim.P. 3.850, alleging that several months after the trial, co-defendant Cecilio Gomez informed the defendant's counsel that he (Cecilio Gomez) had in fact committed the robbery in the case without the assistance of defendant Basilio Gomez.  A sworn affidavit signed by the co-defendant Cecilio Gomez to that effect was attached to the motion.  *Id.*, at 626.  *See also Hubbard v. State*, 912 So.2d 629 (Fla. 1st Dist. Ct. App. 2005) (defendant's alleged newly discovered evidence was sworn testimony of the alleged sexual battery victim that her sexual relations with the defendant had been consensual); *Burns v. State*, 858 So.2d 1229 (Fla. 1st Dist. Ct. App. 2003) (defendant's alleged newly discovered evidence was a new affidavit by a co-defendant acknowledging that this co-defendant lied at trial in implicating defendant Burns as a principal in an arson as having paid the co-defendant to commit the arson).  Again, in the instant case, petitioner has not submitted a sworn statement of James Patrick Bonifay attesting to petitioner's innocence.

Furthermore, petitioner has not demonstrated a likelihood that an evidentiary hearing would produce exculpatory testimony from Bonifay.  *See Jemison v. Nagle*, 158 Fed.Appx. 251 (11th Cir. 2005) ("It is the petitioner's burden to demonstrate a likelihood that an evidentiary hearing will produce the sort of reliable evidence demanded by *Schlup*.") (citing *Wyzykowski v. Dep't of Corrections*, 226 F.3d 1213, 1216-17 (11th Cir. 2000)); *see also, e.g., Sibley*, 226 F.3d at 1206 (rejecting actual innocence claim and declining to remand to the district court for an evidentiary hearing, where petitioner's claim consisted of allegations that his stepson was willing to offer certain testimony and that there was new evidence that his wife (who had already been executed) saw one of her bullets hit the victim in the chest; petitioner offered no affidavits from either his stepson or his wife; moreover, even accepting the petitioner's allegations at face value, they did not meet the standard articulated in *Schlup*); *see also, e.g., Woodson v. Culliver*, 2006 WL 1274050 (M.D. Ala. May 9, 2006) (rejecting actual innocence claim of habeas petitioner who claimed that other individual would testify that he, not petitioner, shot the victim, where the petitioner did not submit any evidence to support his contention that the individual would confess on the witness stand).[3]

Thus, the true nature of petitioner's purported "new reliable evidence" offered in support of his actual innocence claim is Vieitez's testimony concerning the statement Bonifay made to him in 2001.[4]  One of the factors bearing on the probable

---

[3]The district court in *Woodson* explained:

> Woodson's assertion that Teague would actually testify that he shot the victim is speculative, at best.  Woodson does not present an affidavit from Teague indicating that he would so testify if called, nor has Woodson submitted any other evidence, to support his contention that Teague would confess on the witness stand.  Woodson's "actual innocence claim is hindered at the onset by a fatal shortcoming -- he has not presented any actual evidence."  *See Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004).  Woodson must make a threshold showing which he has failed to do.  Mere conclusory allegations are insufficient to support a claim of actual innocence.

*Woodson v. Nagle*, 2006 WL 1274050 at *4.

[4]It is essential that in evaluating petitioner's actual innocence claim, the court clarify the exact nature of petitioner's "newly discovered evidence."  Throughout his amended petition (doc. 39), his response to the state's second motion to dismiss (doc. 59), and his objections to the Second Report (doc. 63), petitioner asserts that his new evidence is Bonifay's "testimony."  *See, e.g.,* doc. 39, pp. 15 & 22 (referring to the new evidence as "Bonifay's exculpatory testimony"); *id.*, pp. 17-18 (asserting

reliability of Vieitez's proposed testimony is the fact that he is an admirer and self-proclaimed "friend" of petitioner. Vieitez opens his affidavit with a lengthy statement describing his personal affection for petitioner:

> I first met Larry Fordham, Jr., on February 11, 1991 when he was arrested and brought to the Escambia County Jail. Throughout the years I have had contact with inmate Fordham when he was in our facility. I found him to always be a polite inmate, never in trouble, [a]lways stayed pretty much to himself and was always reading his Bible.
>
> On June 25, 2001, I went to the Santa Rosa Correctional Institution in Milton, Florida, to pick up inmate Larry Fordham DOC# 217039 to escort him on a funeral furlough to his Grandmothers [sic] funeral. I had the honor of escorting inmate Fordham and spending the day with him. I found out that through the years of his incarceration since leaving the Escambia County Jail, Inmate Fordham has truly been on a mission for youth, to reach out to the young people of my community, Pensacola, Florida. During the eight hours that I personally spent with inmate Fordham the day of the funeral, I found him to be very polite, very courteous, and indeed a perfect gentleman. I found him to be of no threat to society and of no threat to fly. As a professional Correctional Officer, [i]t was an honor for me to have been responsible for inmate Fordham the day of the funeral. I am proud to call inmate Fordham my friend. He is truly an asset to our community. I see the positive responses of his youth awareness program and jail impact tour that is presently being conducted here in Escambia County. The youth awareness jail impact tour program is endorsed by the Escambia County [S]heriff's Office of whom I am employed.

(Doc. 8, ex. BB, p. 11). In addition, it is noted that one of the witnesses to Vieitez's affidavit is petitioner's father. (*Id.*). These factors indicate that Deputy Vieitez may not be a disinterested witness. However, even putting these misgivings aside and assuming *arguendo* that Vieitez's testimony is reliable, this evidence, considered in light of "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would

---

that "Bonifay is willing and available to testify, and his testimony is substantive proof of the petitioner's innocence."); *id.*, p. 20 (referring to "Bonifay's proffered testimony"); *id.*, p. 24 (asserting that "Bonifay's exculpatory testimony would be a 'crucial, critical, [and] highly significant factor' in the defense."); doc. 59, ex. D, p. 23 (asserting that "Bonifay is available to testify that Fordham had no role in planning or committing the robbery/murder . . ."); doc. 63, p. 31 (asserting that "If Bonifay were permitted to testify at a new trial, there is a strong probability that Petitioner would be acquitted. . . ."). As discussed *supra*, petitioner's assertions that Bonifay would actually testify as petitioner suggests is speculative, at best.

govern at trial," *House*, 126 S.Ct. at 1077 (internal quotations omitted), is so overwhelmed by the weight of evidence of petitioner's guilt that it is insufficient to raise a question as to petitioner's factual innocence.  *See, e.g., Doe v. Menefee*, 391 F.3d 147, 162 (2nd Cir. 2004) (concluding that district court's finding that the hearing testimony of petitioner and witness constituted new reliable evidence of petitioner's actual innocence was clearly erroneous in light of petitioner's prior statements and admissions of guilt and the other evidence in the record); *see Sibley*, 226 F.3d at 1206 (rejecting habeas petitioner's actual innocence claim proffered to excuse the untimely filing of his federal habeas petition after finding that the petitioner "provided no basis upon which a court can second-guess the jury's verdict.").

Petitioner was convicted of felony murder and robbery.  In other words, the jury found beyond a reasonable doubt that he knowingly aided, abetted or helped in the commission of the Trout Auto Parts robbery, and that Mr. Coker's (the victim's) death occurred as a consequence of and while petitioner was participating in that robbery, even though petitioner was not the triggerman.  Petitioner's defense at trial was that when he drove co-defendants James Patrick Bonifay and Clifford Barth to Trout Auto Parts on January 26, 1991, he did not know that an armed robbery was going to occur.  As part of its case-in-chief, the State presented petitioner's sworn statement to police.[5]  In that recorded statement, petitioner admitted the following.  On Friday night, January 25, 1991 (the night before the robbery), petitioner drove Bonifay and Barth to Trout Auto Parts after they told him that Bonifay "had to check on some things."  (Doc. 8, ex. B, p. 226).  Petitioner was driving his yellow Mustang. (*Id.*, p. 227).  Bonifay got out of the car, walked to the drive-through window and talked to the clerk.  He returned to the car and had a conversation with Barth to the

---

[5]Petitioner asserts that his confession was involuntary, and that counsel was ineffective for failing to move to suppress it.  However, as defense counsel testified at the evidentiary hearing in petitioner's first Rule 3.850 proceeding, counsel knew that the State was using co-defendant Barth's testimony against petitioner.  He was also aware that there was substantial evidence of petitioner providing a ski mask to the triggerman, buying bullets and driving to the scene two times.  Barth's testimony made it necessary for petitioner to testify, regardless of whether petitioner's confession was suppressed.  Had petitioner taken the stand and testified contrary to the facts in his statement, his statement would have been admissible as a prior inconsistent statement, and used against him anyway.  (*See* Doc. 8, ex. U; Doc. 55, ex. LL).  That is, the state could have used petitioner's confession to impeach him when he testified, under it if it had been suppressed.  *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Reaves v. State*, 458 So.2d 53 (Fla. 3d DCA 1984).

effect of "[i]t's cool, we can do this tomorrow night."  (*Id.*, p. 227).  The next night (the night of the robbery), petitioner and Bonifay got together again.  Instead of driving his yellow Mustang, petitioner drove his father's dark-colored Blazer.  Petitioner brought a ski mask with him at Bonifay's request.  (*Id.*, pp. 227, 229).  When petitioner picked up Bonifay, he saw Bonifay put a pair of bolt cutters into a gym bag.  Bonifay then put the bag into petitioner's truck.  (*Id.*, pp. 229, 243).  The two drove to Clifford Barth's house, but because Barth was not ready they left and drove to a Wal-Mart where petitioner purchased bullets for Bonifay.  (*Id.*, p. 230).  Petitioner and Bonifay then went back to Barth's house.  According to petitioner, "Cliff [Barth] got in the truck and he had a ski mask, and then I knew then that there was going to be a burglary.  I knew then that there was going to be a burglary.  And this was about oh, 45 minutes before it all happened."  (*Id.*).  As the three drove to Trout Auto Parts, Bonifay told petitioner and Barth what they were supposed to do.  (*Id.*, pp. 230-31).  Specifically, petitioner was told "to park in the parking lot and that Pat [Bonifay] was going to go up to the window and he would signal for Cliff to come to the window.  And what he wanted me and Cliff to do while we were out in the car was tell him if there was any traffic coming and when the traffic ceased."  (*Id.*, p. 230).  When the three reached Trout Auto Parts, petitioner parked across the street where they all watched the store for a few minutes.  (*Id.*, p. 231 & 233-34).  Once the last customer left the store, petitioner drove into the Trout Auto Parts parking lot.  Petitioner was aware that someone was still in the store.  (*Id.*, p. 234).  Bonifay exited the vehicle, carrying the ski mask.  (*Id.*, p. 231).  He walked up to the drive-through window, leaned up to it and put his arms inside the window.  Bonifay then signaled for Barth to get out of the car.  Barth grabbed the gym bag, jumped out of the car and ran up to the window.  Petitioner then drove around the side of the building as he had been instructed, and waited for them.  (*Id.*, p. 232).  After approximately five minutes, Bonifay and Barth ran out of the store and jumped into petitioner's vehicle.  Petitioner drove off and eventually parked in a parking lot, where Barth starting

counting the money and handed petitioner "a whole bunch of money." (*Id.*).  At the end of petitioner's recorded statement one of the officer's clarified:

> Q [Investigator Cotton].  [Y]ou were talking about doing a robbery on the way over, is that correct?  In other words, what you were going to do and what they were going to do?
>
> A [Petitioner].  What I was supposed to do is they were telling me what me and Cliff were supposed to do, right.
>
> Q.  You were aware that that's what was fixing to happen there and that was the reason you were going to get some money, is that correct?
>
> A.  Yes, sir, when we passed Airport Boulevard he started telling me -- well, not just telling me, but, you know, telling Cliff also that Robbie (co-defendant Robin Archer) had set it up and that there was going to be some money made and everything, and that this is what I was supposed to do and this is what Cliff was supposed to do and that.

(*Id.*, pp. 242-43).

Co-defendant Clifford Barth testified at petitioner's trial as follows.  Bonifay contacted him 2-3 days prior to the robbery, told him that he wanted to rob Trout Auto Parts, and described how he wanted to do it.  (*Id.*, p. 153).  Initially, the plan was that George Wynn would drive them.  (*Id.*).  On January 25, 1991, the night before the robbery, petitioner drove Barth and Bonifay to a convenience store to meet with George Wynn.  (*Id.*, p. 153, 157).  On the way and in petitioner's presence, Barth and Bonifay discussed robbing Trout Auto Parts.  (*Id.*, p. 155).  They detailed how it was going to happen, and what each person was expected to do.  (*Id.*, p. 156).  There was a blue bag and bolt cutters in the back of petitioner's car.  (*Id.*, p. 159).  Barth and Bonifay had ski masks and gloves.  (*Id.*, p. 190).  Bonifay had gotten his ski mask from petitioner.  (*Id.*, p. 160).  When the three men got to the convenience store, Bonifay and Barth met with Wynn outside the store while petitioner stayed in his car. (*Id.*, p. 158).  Wynn told Bonifay and Barth that he did not think the plan was a good idea, and refused to participate.  Bonifay got back into petitioner's car and asked petitioner if he would be the driver.  Petitioner hesitated, expressing concern that his

car was noticeable because it was a yellow sports car, then said yes. (*Id.*).
Petitioner then drove Barth and Bonifay to Robin Archer's house. (*Id.*, p. 155).  Once
they arrived, Bonifay got out of the car while petitioner and Barth waited in the car.
Archer gave something to Bonifay.  When Bonifay got back into petitioner's car he
showed Barth and petitioner a gun.  (*Id.*).  Bonifay, Barth and petitioner drove by
Trout Auto Parts a couple of times while the three discussed whether petitioner
should park in front of the store or on the side of the store.  (*Id.*, pp. 159-60).
Petitioner suggested parking on the side so his car would not be noticed.  (*Id.*, p.
160).  Bonifay, wearing his gloves, got out and walked up to the drive-through
window of the store.  (*Id.*, p. 191).  He did not wear the ski mask, but carried it with
him because the plan was for him and Barth to put their masks on just prior to
entering the store so the inside security camera would not pick up their faces.  (*Id.*,
p. 190).  Five minutes later, Bonifay returned to petitioner's car and said he couldn't
do it because the clerk heard him cock the gun.  (*Id.*, p. 161).  The three left.

The next day (Saturday, January 26, 1991), Bonifay contacted Barth and they
agreed to try it again that night.  (*Id.*, p. 162).  Bonifay and petitioner came to Barth's
house.  The three sat in Barth's living room and talked about the robbery.  Bonifay
stated that this time he was going to shoot the store clerk when he went up to the
drive-through window.  (*Id.*, pp. 162-63).  Bonifay and petitioner left Barth's house
to go buy bullets.  (*Id.*, pp. 163-64).  Petitioner bought the bullets because he was the
oldest.  (*Id.*, p. 166).  When petitioner and Bonifay returned, Barth got into
petitioner's truck.  Bonifay loaded the gun while sitting next to petitioner.  (*Id.*, p.
165).  With the gym bag and bolt cutters in the back of petitioner's truck, the three
drove to Trout Auto Parts and parked across the street.  (*Id.*, p. 166).  After the last
customer left, petitioner drove into the Trout parking lot and parked about five or ten
feet from the drive-through window.  (*Id.*, p. 168).  Bonifay exited, told petitioner not
to leave him, and went up to the window.  (*Id.*, p. 167).  From petitioner's truck, Barth
could see the clerk and what was going on.  (*Id.*, p. 167).  Petitioner had a better view
in the front seat.  (*Id.*, p. 168).  Barth saw and heard Bonifay shoot the clerk.  The

clerk started screaming.  (*Id.*).  Bonifay motioned for Barth to get out of the truck. Bonifay then went through the drive-through window and shot the clerk a second time.  (*Id.*).  Barth got out of the truck with the bolt cutters, and entered the store. (*Id.*, pp. 169-70).  Bonifay and Barth started grabbing money.  Before they left the store, Bonifay shot the clerk two more times despite the clerk's plea that his life be spared. (*Id.*, p. 170).  By that time, petitioner had pulled to the side of the store and Bonifay and Barth ran out of the store and got into petitioner's truck.  The three drove off.  When they counted the money, petitioner remarked, "who says crime doesn't pay?"  (*Id.*, p. 171).[6]

Daniel Ray Wells testified that he was working at Trout Auto Parts on the night before the robbery and murder (*id.*, p. 137).  Right at closing time, a "guy" suddenly appeared at the window.  (*id.*, p. 138-39).  When the guy put his hands up in the window, Wells noticed he was wearing gloves even though it wasn't cold outside (*id.*, p. 138).  Wells, who had been robbed before, was spooked by the man's sudden appearance and gloves (*id.*, p. 139).  The guy asked Mr. Wells about a part.  As Wells was looking up the part, he heard the sound of a gun cocking (*id.*, p. 140).  He pushed the metal door of the drive-through window closed, and hurried the guy off.

George Wynn testified that when he told Patrick Bonifay on Friday night that he did not want to participate in the Trout Auto Parts robbery, Bonifay told him not to worry about it, that he already talked to petitioner about the planned robbery, and that petitioner said he would drive if Wynn didn't.  (*Id.*, pp. 410, 411, 421).  At that time, it was known that the robbery was going to involve a shooting.  (*Id.*).  Wynn further testified that early on Saturday Bonifay told him (Wynn) that the robbery had

---

[6]Barth testified for the State against Bonifay and Archer during their respective trials.  At the time petitioner came up for trial, defense counsel had the sworn testimony of Barth from the first two trials as well as Barth's statements to law enforcement.  Petitioner's defense counsel impeached portions of Barth's trial testimony using these materials.  During the State's rehabilitation of Barth, Barth testified that in his past trial testimony and sworn statement to police, he consistently stated that petitioner knew on Friday night that he was driving the getaway car for a robbery, and that petitioner knew there was going to be a shooting (ex. B, pp. 207-08).  *See also* Ex. J, Motion for Postconviction Relief, appx. F, Transcript of the Confession of Clifford Barth dtd. 2/11/91, p. 3; appx. C, Testimony of Clifford Barth in the trial of James Bonifay, pp. 22-31).

been foiled on Friday night because he thought the clerk might have heard the gun cock.  (*Id.*, pp. 412, 421).

The defense presented petitioner's testimony.  In stating the events of Friday night, petitioner related that he drove Patrick Bonifay (and, at times, Clifford Barth) to various places, including to the meeting with George Wynn and to Trout Auto Parts.  (*Id.*, pp. 321-29).  According to petitioner's testimony, he neither saw nor heard anything indicating that a robbery and shooting were being planned.  He was just driving because he was Bonifay's "gopher."  (*Id.*, pp. 356-57).  Petitioner denied seeing a gun on Friday night.  (*Id.*, p. 329).  He acknowledged supplying Bonifay with a ski mask, but testified that he did so on Saturday, not Friday, night.  (*Id.*, pp. 329, 331).  Petitioner said he thought nothing of Bonifay's request for a ski mask because it was mid-January.  (*Id.*, p. 331-32).  Petitioner also acknowledged going with Bonifay to buy ammunition on Saturday night, but said he was told by Bonifay that Bonifay and Barth were going to go target practice shooting.  (*Id.*, p. 330).  According to petitioner, Bonifay and Barth were the only ones who went inside Barth's home on Saturday.  (*Id.*, p. 331).  When Barth got into petitioner's truck, petitioner noticed he had a ski mask.  Petitioner "had already seen some bolt cutters, and [he] knew something was wrong."  (*Id.*).  The trio continued to drive around and eventually drove past Trout Auto Parts.  First petitioner passed it, but after Bonifay told him to turn around petitioner did.  (*Id.*, pp. 334-35).  Petitioner parked in a parking lot across the street from the store.  Bonifay told petitioner he needed some money and that he was "going to take care of business that [Robin Archer] set up for [him]."  (*Id.*, p. 335).  Bonifay also told petitioner that all he had to do was drive, and that the less petitioner knew the better.  After the last customer left the Trout Auto Parts store, Bonifay directed petitioner to drive across the street to the store, which petitioner did.  Bonifay got out of petitioner's truck, threatened petitioner not to go anywhere, went to the drive- through window, stuck his arms in the window, and then turned and signaled for Barth to jump out of the truck (*id.*, p. 336).  Petitioner did not hear any shots.  Barth jumped out of the truck with the bolt cutters.  Petitioner drove to

the side of the building and waited for them.  Five minutes later Bonifay and Barth exited the store, jumped into petitioner's truck and yelled for petitioner to go.  (*Id.*, p. 337).  Petitioner turned off the headlights and drove until Bonifay directed him to stop.  The first time petitioner saw a gun was when they started counting the money.  (*Id.*, p. 338).  Petitioner drove Barth home.  Bonifay spent the night at petitioner's house, where he told petitioner he killed the clerk.[7]

On cross-examination, petitioner denied sensing anything was wrong, even after Bonifay requested the ski mask, put bolt cutters and a gym bag in his truck, and told petitioner he needed ammunition.  (*Id.*, pp. 354-55; 361-64).  Petitioner also denied going inside Clifford Barth's house on Saturday night.  (*Id.*, pp. 364, 370-71).  Eventually, petitioner acknowledged that before he got to Trout Auto Parts Saturday night, he knew that a crime was going to be committed there.  (*Id.*, p. 383, 385).  He explained, however, that he did not know until ten minutes prior to arriving at Trout Auto Parts on Saturday night that a crime was going to occur, and that he was wrong when he told police it was forty-five minutes.  (*Id.*, p. 386).  Petitioner acknowledged going to Cordova Mall the next day and spending the money he received from the robbery, but said he did not enjoy it and that Bonifay made him do it.

Petitioner urges this court to evaluate Vieitez's proposed testimony in light of the following: (1) Bonifay's statements as conveyed in the 1994 sworn statements

---

[7]Defense counsel summed up petitioner's defense during closing argument as follows:

Now [petitioner]'s a follower, he's weak-minded when it comes to Bonifay telling him where to go, what to do, he will give him gas money.  He knew he was involved in underhanded things such as drug dealings.  It's not inconceivable and inconsistent with the evidence that what he thought he was participating in up there at Trout . . . was some sort of ripoff, some sort of Robin Hood affair where there was some money owed or there was an inside deal going on at Trout, that there was going to be something staged that looked like a robbery or looked like a burglary and they were going to make some bucks off of it.  But had he known somebody was going to be killed, would he have been there?  No.  And you're going to get an instruction from the Judge on that, dealing with whether or not this [the killing] was an independent act, outside the common design that was not in furtherance of the robbery.

(Doc. 8, ex. B, p. 451).

of Robin Archer and Sergeant Martin, and in the 1993 statement of Jennifer (Morris) Tatum;[8] (2) the fact that the victim's widow dismissed petitioner as a defendant from

---

[8]The court has considered the Vieitez affidavit in light of Sergeant Martin's 1994 statement, Robin Archer's 1994 statement, and Ms. Morris' 1993 statement. These statements are of little probative value.

Sergeant Martin was one of the officers who arrested Patrick Bonifay. In 1994, counsel for petitioner deposed Martin in connection with petitioner's first motion for postconviction relief. Petitioner's counsel asked Sergeant Martin to discuss any comments Bonifay made concerning petitioner's involvement.

Q [Counsel for petitioner]. Prior to Patrick Bonifay giving a recorded statement, did he make any comments of Eddie's involvement?

A [Sergeant Martin]. After we picked Bonifay up we brought him to the Sheriff's Department, Investigation Division. I believe we picked him up at Escambia High School, he was in a night class out there.

We transported him to the Sheriff's Office, Investigation Division. We were sitting in Captain Terry Shelby's office. Bonifay started talking about the shooting.

During the course of the first part of his conversation he [Bonifay] made some reference and, like I say, I'm going strictly by memory now, that Eddie [petitioner] -- and I don't know if he included Bart[h] or not, but anyway I remember he said Eddie or, 'They didn't know what was going on. We were going to make it look like a robbery. I was going to split the money with them and my cousin Robin Archer was going to pay me for the killing later,' or something to that effect.

. . . .

Q. Was there any evidence during the course of this investigation that the killing was actually contract killing? Do you know anything about that?

A. Other than statements made by Patrick Bonifay and that his cousin Robin Archer wanted them to kill this guy and he was going to pay them to do it.

His statement was something to the effect that he was going to split the money with Eddie [petitioner] and Bart [Clifford Barth], that was in the store when they robbed it. He was going to kill this guy and he was going to keep all of that money. His cousin Robin Archer was going to pay him later for the killing.

Basically he [Bonifay] said that his cousin sent him in there, set this thing up to kill this guy. In fact, he made some kind of statement, he said, "I went to get my money the next day and he laughed at me and told me I killed the wrong guy," or something like that.

Q. Mr. Bonifay indicated to you that Eddie [petitioner] and you don't remember if it was Bart[h], too, but that they didn't know about the killing?

A. Right.

(Ex. J, pp. 444-47).  The alleged statements of Bonifay, as related by Martin, appear to relate only to petitioner's awareness of the preexisting "contract killing" conspiracy between Bonifay and co-defendant Robin Archer.  The statements related by Martin do not indicate that petitioner was unaware that he was participating in a robbery.  Under Florida law, petitioner's willing and active participation in the robbery, where death was a foreseeable consequence, and where the killing of Mr. Coker was committed during the course of and in furtherance of the robbery, would still subject petitioner to a conviction for felony murder.  Therefore, a reasonable juror would likely find Martin's statement of little, if any, probative value.

Petitioner also urges this court to consider Bonifay's statements as conveyed in a tape-recorded interviewed conducted of Robin Archer by petitioner's father in 1994.  There, Archer described exactly what Bonifay said while the two were being transported to state prison.  Then, upon very leading questions from petitioner's father, Archer offered his interpretation of what Bonifay meant:

Q [Petitioner's father].  Okay.  Now, did Patrick Bonifay ever tell you what Eddie Fordham's involvement was?

A [Robin Archer].  All he told me was Eddie knew nothing and Eddie drove the car.

Q.  Eddie knew nothing, that all Eddie did was drive the car?

A.  He told me that Eddie knew nothing.

Q.  Did Eddie -- did Eddie drive Patrick Bonifay -- did he drive Patrick Bonifay around a lot?

A.  Yes, sir.  He was Patrick's chauffeur, gopher, however you want to phrase it.  That's all Patrick used him for was this.

Q.  Would it be fair to say that Patrick was used -- used Eddie Fordham as a gopher?

A.  Yes, sir.

Q.  As a taxi driver to drive him around since Patrick didn't have a car?  Is that a fair question?

A.  Yes, sir.

Q.  Okay.  Did Patrick tell you that Eddie Fordham had played no part in the robbery?

A.  What Patrick told me was that Eddie knew nothing.  Okay.

Q.  Okay.  So you're indicating that Eddie did not know about the robbery according to what Patrick Bonifay told you?

A.  In my opinion, that's the way I took it.  Yes, sir.

(*Id.*, p. 488).  In essence, Archer's statement merely conveys a general statement by Bonifay that petitioner "knew nothing."  A reasonable juror would likely find Archer's interpretation of Bonifay's vague statement of little probative value.

Petitioner also urges this court to consider a statement made by Jennifer (Morris) Tatum in 1993 (doc. 59, ex. D, p. 18).  He asserts that in her statement, Ms. Morris attests that "Bonifay told her that Fordham did not know about the robbery-murder plans." (*Id.*).  The statement to which petitioner refers is Ms. Tatum's third statement.  It was made on June 22, 1993, and is based upon a written "Question and Answer" document (mimicking a deposition) prepared by petitioner's father.  In that document, petitioner's father reports that Ms. Tatum stated that Bonifay told her that he [Bonifay] and Barth robbed the store; that he [Bonifay] killed the clerk; that petitioner did not go in the store; and that all petitioner did was drive. (Ex. J, pp. 434-35).  Petitioner's father reports that after revealing what Bonifay told her, Ms. Tatum stated the following opinion:  "Eddie Fordham [petitioner], from what Patrick Bonifay told me, could not have known about a robbery or a murder that was to take place.  This is my honest opinion." (*Id.*, p. 435).  In the 1993 statement does not possess sufficient "indicia of reliability," nor does it contain relevant evidence.  The self-serving "interview" by petitioner's father merely contains an opinion by Ms. Tatum as to petitioner's involvement.  A reasonable juror would give little weight to lay opinion evidence about petitioner's guilt.  Furthermore, the statements attributed to Bonifay do not indicate that petitioner did not know about the robbery plan.  The fact that he drove but did not enter the store does not indicate that he did not knowingly and intentionally participate in the robbery, where death was a foreseeable consequence.

This court's conclusion that a reasonable juror would give little weight to Ms. Tatum's 1993 statement is reinforced by the record.  Notably, in the 1993 statement, Ms. Tatum asserts that she previously made the same statements to the Escambia County Sheriff's Department and to one of the prosecuting attorneys (Mike Patterson).  The record contains copies of those prior statements.  In a recorded statement made to Investigator Tom O'Neal on February 14, 1991, Ms. Tatum stated that the evening after the Trout Auto Parts Store incident, Bonifay asked her if she had heard about the murder at Trout, then confessed to her, "I did it." He described the incident to her as follows:

> A [Jennifer (Morris) Tatum].  He [Bonifay] said that him and Eddie and Cliff went over to Trout and um they killed the man and I asked him why he did it and he just said cause he needed the money.  He said that uh they drove up there in Eddie's Dad's Blazer and um went to the window and were going to go in from the window and the man saw Pat's [Bonifay's] face, so Pat went ahead and went in and um got the man somehow down on the ground, I'm not sure if he shot him or not, got him on the ground and (inaudible) asked him where the money was and the man finally told them and he was making the man believe that he wasn't going to shoot him and the man started pleading with them, please don't shoot me, I got kids, I got a family, please don't shoot me and Pat said and you know Pat was just telling him, I guess he was telling him to shut up and um, Pat was, he said he had on a ski mask, a flannel shirt, jeans and like black suede or leather Reeboks and he said he shot the man in the head . . .
>
> . . . .
>
> Q [Investigator O'Neal].  And he mentioned to you that uh he and Eddie and Cliff had done it?
>
> A.  Right.
>
> Q.  Driving Eddie's Dad's Blazer and that uh the clerk had seen Pat's face?
>
> A.  That's why he had to kill him, that's what he said.

**her wrongful death lawsuit;[9] (3) defense evidence which petitioner contends was wrongfully excluded from trial,[10] (4) the fact that some of the evidence used to**

(Ex. J, Recorded Statement of Jennifer Morris dtd. 2/14/91).

Prior to petitioner's trial, petitioner's trial counsel conducted a discovery deposition of Ms. (Morris) Tatum.  The deposition took place on May 3, 1991.  (Ex. J, Dep. of Jennifer Morris dtd. 5/3/91).  Ms. Tatum was asked to describe what Bonifay told her the night he confessed to the Trout Auto Parts robbery and murder.  She stated, in relevant part:

A [Ms. Tatum]. . . . [H]e said that he killed a man at Trout.  I asked him why he did it and he said because the man saw his face.  And I asked him what he was doing there and he said he was robbing the place.  And then he kind of went into detail and explained everything to me about what he did and all that.

Q [Petitioner's trial counsel].  Did he get specific with you as far as Eddie Fordham's involvement?

A.  All he said was that Eddie sat in the truck.  But he got specific about him and Cliff.

. . . .

Q.  Did he tell you that Eddie Fordham was a [sic] unwilling participant in this?

A.  He really didn't say anything about Eddie except for that he sat in the truck.  And I really don't know Eddie that well.

(Ex. J, Morris Dep., pp. 13-14, 17).  These prior statements underscore the fact that all Bonifay related to Tatum concerning petitioner's involvement was the fact that petitioner sat in the truck while the robbery took place.  Bonifay disclosed nothing with regard to whether petitioner knew that he was participating in the robbery.

One final note with regard to the Martin, Archer and Tatum statements.  This court previously indicated that the factual predicate of the Martin, Archer and Tatum statements is essentially the same as the factual predicate of petitioner's "actual innocence" claims based on the Vieitez affidavit (Grounds 1-3 of the amended petition), in that all of these claims are grounded in what petitioner believes to be exculpatory statements by Bonifay to others concerning his foreknowledge of the crimes.  (*See* doc. 60, pp. 9-12).  This finding is not a comment on, nor does it affect a determination of, the probative value of any one of those statements to petitioner's *Schlup* claim.

[9]The undersigned finds that petitioner's dismissal from the wrongful death suit is irrelevant, and that a reasonable juror would likely find this fact of no probative value with regard to petitioner's innocence.

[10]Petitioner asks the court to consider the proposed testimony of Bruce White.  Petitioner contends that at his trial he sought to call Mr. White as a defense witness, but the testimony was excluded as irrelevant.  According to petitioner, Mr. White "would have testified that Trout Auto parts was in fact a central hub for the trafficking of drugs into Pensacola."  (Doc. 59, ex. D, p. 26; doc. 63, p. 24).  Petitioner contends this was crucial testimony because it would have corroborated his trial testimony that he thought he, Bonifay and Barth were going to Trout Auto Parts so Bonifay and Barth "could complete a drug transaction."  (*Id.*, p. 25; doc. 63, p. 25).  The undersigned has considered the

convict him was wrongfully admitted,[11] (5) evidence brought out during counsel's cross-examination of Clifford Barth which tended to impeach Barth's credibility, (6) petitioner's trial testimony and (7) the Schisler affidavit.  (Doc. 59, ex. D, pp. 17-26; doc. 19, pp. 17-26; doc. 63, pp. 17-36).   The court has considered petitioner's procedural actual innocence claim in light of the evidence in the record as a whole, and concludes that petitioner's new evidence -- Deputy Vieitez's affidavit -- is insufficient to raise a question as to petitioner's factual innocence.  The jury heard direct evidence of petitioner's intentional participation in the robbery, including his detailed confession and co-defendant Barth's detailed account of events.  The jury had the opportunity to consider this evidence, as well as petitioner's sworn trial testimony.  The jury clearly rejected petitioner's defense, apparently agreeing with the State that "walking through [petitioner's] testimony [was] like walking through a mine field."  (Doc. 8, ex. B, p. 454).  This court will not second guess the jury. Given that the jury accepted as true the detailed accounts of events offered by the State, the undersigned simply cannot say that it is more likely than not that no reasonable, properly-instructed juror would have found petitioner guilty beyond a reasonable doubt had it heard Deputy Vieitez's testimony or the other evidence petitioner has proffered.  The affidavit of former juror Schisler does not alter this conclusion because it comments on the effect of evidence that is not before this court.  (See doc. 64, ex. B).[12]

---

proposed testimony, but finds it irrelevant to petitioner's actual innocence claim.

[11]Petitioner urges this court to consider the fact that his statement to police, which was admitted at trial, was "involuntarily induced."  (Doc. 59, ex. D, p. 24).  Petitioner further argues that the State should not have been allowed to ask him on cross-examination if he told someone he was "going to beat this case."  Additionally, petitioner contends the trial court improperly allowed the State to present hearsay testimony by George Wynn that Patrick Bonifay told him that petitioner would drive if Wynn (the original intended driver) backed out, and that the State "continuously benefited [sic] from the use of Bonifay's out-of-court statements in its capital murder case against Fordham."  (Doc. 59, ex. D, pp. 21-22; doc. 63, p. 30).  The court will not disregard this trial evidence.

[12]Schisler states, in relevant part, "If Mr. Bonifay's statement to Deputy Vieitez is true, and had this evidence [Bonifay's testimony to that effect] been presented to me at the time of trial, there is a probability I may have also found Mr. Fordham not guilty of armed robbery."

## CONCLUSION

Petitioner has not provided any evidence that James Patrick Bonifay will testify to his innocence.  To the contrary, the evidence presented by petitioner indicates that Bonifay will not testify to his innocence, having rejected attempts by petitioner's father and lawyers to obtain such testimony. (Doc. 63, p. 18 n. 11).  In light of the "new evidence" petitioner <u>has</u> produced, he has not shown that it is more likely than not that any reasonable, properly instructed juror would have reasonable doubt about his guilt.  The fact remains that petitioner gave a statement to police that he knew forty-five minutes before the Trout Auto Parts robbery that he was driving his cohorts there to commit a robbery.  That made him guilty of the crimes for which he was convicted.  The jury was entitled to, and obviously did, believe that petitioner spoke the truth when he gave his statement to police, even thought he tried at trial to convince the jury that he was confused and under pressure.  Furthermore, petitioner has not demonstrated a likelihood that an evidentiary hearing will produce the sort of evidence demanded by *Schlup*.  Nothing in the Supreme Court's *House* opinion conflicts with these conclusions.[13]

---

[13]As a final note, the undersigned finds it appropriate to clarify to the District Judge two inaccurate statements petitioner made in his objections to the Second Report and Recommendation. First, in the "Background" section of his objections, petitioner states with regard to the confession which was used against him at trial:

> [S]tate-court judge Laura Melvin found Petitioner's confession to police to have been involuntarily induced by psychological pressure and undue police-interrogation tactics without his parents or lawyer present. Judge Melvin further ruled that the confession would have been suppressed had trial counsel effectively filed a motion to suppress.

(Doc. 63, p. 4).  Without regard to this assertion's accuracy, it makes little practical difference. <u>Suppression of the confession would have been of little value to petitioner because, since he testified, it could have been used to impeach his testimony to the extent that his testimony was inconsistent with it</u>. *See*, n. 5, *supra*.  This assertion also misrepresents the record.  <u>In fact</u>, Judge Melvin found that trial counsel was per se ineffective <u>for failing to inquire pretrial</u> as to the voluntariness of and circumstances surrounding the taking of petitioner's statement because "[w]ith such inquiry, defense counsel <u>may</u> then have determined a sufficient factual and/or legal basis for filing a Motion to Suppress the Statement, arguing as the defendant now asserts that there had been an equivocal invocation of *Miranda*; the law in Florida would have required the suppression of such a statement." (Doc. 8, ex. U) (emphasis added).  Judge Melvin <u>did not state an opinion on the voluntariness of petitioner's confession and, in fact, she explicitly declined to reach a conclusion on that issue</u>, noting that "with the passage of time and fading of memories, it is difficult to conclude that such a motion

To put this case into perspective, the undersigned offers a comparison of the evidence petitioner has proffered with that adduced in *Schlup* and *House*.  In *Schlup* a white prisoner, Schlup, was convicted of murdering a fellow inmate, Arthur Dade, who was black.  The State's evidence consisted primarily of the testimony of two corrections officers who had witnessed the killing.  As summarized by the United State Supreme Court:

> On the day of the murder, Sergeant Roger Flowers was on duty on Walk 1 and Walk 2, the two walks on the lower floor of the prison's high security area.  Flowers testified that he first released the inmates on Walk 2 for their noon meal and relocked their cells.  After unlocking the cells to release the inmates on Walk 1, Flowers noticed an inmate named Rodnie Stewart moving against the flow of traffic carrying a container of steaming liquid.  Flowers watched as Stewart threw the liquid in Dade's face.  According to Flowers, Schlup then jumped on Dade's back, and Robert O'Neal joined in the attack.  Flowers shouted for help, entered the walk, and grabbed Stewart as the two other assailants fled.

> Officer John Maylee witnessed the attack from Walk 7, which is three levels and some 40-50 feet above Walks 1 and 2.  Maylee first noticed Schlup, Stewart, and O'Neal as they were running from Walk 2 to Walk 1 against the flow of traffic.  According to Maylee's testimony, Stewart threw a container of liquid at Dade's face, and then Schlup jumped on Dade's back.  O'Neal then stabbed Dade several times in the

---

would have been available in good faith to defense." (*Id*.).  Judge Melvin emphasized that her finding "focuses on the failure to inquire pretrial, rather than on a conclusion that defense counsel failed to pursue the filing of a motion clearly available."  She then went on to discuss that without reaching a conclusion that a Motion to Suppress was available but not filed, petitioner failed to sustain his burden of proof as to *Strickland*'s prejudice prong because petitioner failed to establish that there is a reasonable probability that the outcome of the trial would have been different had his statement been suppressed.  (*Id*.).  In reaching this conclusion, Judge Melvin identified some of the other evidence of petitioner's guilt (other than petitioner's statement to police).

Another inaccurate statement petitioner makes in his objections to the Second Report is that the undersigned has "speculated" in finding that "petitioner has not provided reliable evidence that James Patrick Bonifay will testify to his [petitioner's] innocence." (Doc. 60, p. 28).  The court's finding is based on fact, not speculation.  As previously discussed, throughout his response to respondent's second motion to dismiss and his objections to the Second Report, it is <u>petitioner</u> who <u>admits</u> that Bonifay is unwilling to provide a sworn statement, oral or written, which exculpates him.  Indeed, <u>petitioner admits</u> that Bonifay is unwilling even to confirm that he made any of the alleged exculpatory statements that have been attributed to him.  (*See* doc. 63, p. 14 n. 9, p. 18 n. 11).

chest, ran down the walk, and threw the weapon out a window.  Maylee did not see what happened to Schlup or Stewart after the stabbing.

The State produced no physical evidence connecting Schlup to the killing, and no witness other than Flowers and Maylee testified to Schlup's involvement in the murder.

Schlup's defense was that the State had the wrong man.

*Schlup*, 513 U.S. at 302-03, 115 S.Ct. at 854-55 (footnotes omitted).

Schlup's proof of actual innocence came from (1) a videotape that showed him to be in the prison dining room when the murder took place some distance away, (2) the statement of a prison clerk who corroborated the time that the alarm sounded (in relation to the time Schlup entered the dining room) when there was no reason for the clerk to know that the timing made a critical difference, (3) an affidavit from a prison lieutenant who observed Schlup for over two minutes as he walked to the dining room, and who stated that Schlup was not hurrying, perspiring, or breathing hard, which would have been the case had he gone from the murder scene in time to arrive in the dining room when the videotape placed him there, and (4) affidavits from black inmates attesting to the innocence of a white defendant in a racially motivated killing.  The *Schlup* Court concluded that the habeas court should consider this evidence to determine whether the new facts "raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without assurance that the trial was untainted by constitutional error."  115 S.Ct. at 317.

In *House*, Paul House was convicted of murdering Mrs. Carolyn Muncey.  The evidence supporting the conviction included: (1) testimony from Mrs. Muncey's children that late at night they overheard their mother talking to someone with a deep voice, like House (but also like their grandfather), telling her that Mr. Muncey had been involved in an accident; (2) Mr. Muncey came home soon thereafter, and asked where Mrs. Muncey was; (3) the next afternoon a Mr. Hensley saw House near an embankment in the Muncey's neighborhood, wiping his hands with a black rag, and House told Mr. Hensley that he had heard that Mrs. Muncey was missing and that he was looking for Mr. Muncey; (4) Mr. Hensley later came back and found Mrs. Muncey's body down the embankment near where he had seen House, and near

where House's car had been parked; (5) the autopsy showed that Mrs. Muncey had been killed by being struck in the head; (6) House was interviewed by law enforcement and lied about his whereabouts on the night in question, and had scratches on his hands and arms; (7) law enforcement later seized the pants House was wearing on the night of the murder, which were "heavily soiled" with "reddish brown stains;" (8) House's pants, blood samples from Mrs. Muncey's autopsy and other evidence were packed in a box and taken to the FBI lab in Washington, D.C.; (9) there was human blood on the pants which was not House's blood; and (10) there was semen in Mrs. Muncey's panties that could have been from House (although House was not charged with sexual assault, the prosecution strongly suggested that such an assault occurred, and that Mrs. Muncey was killed to silence her).

During House's federal habeas proceeding, he presented the following exculpatory evidence: (1) DNA testing establishing that the semen in Mrs. Muncey's panties came from her husband, not House; (2) testimonial and physical evidence of "evidentiary disarray" surrounding the State's blood evidence which would prevent reasonable jurors from placing significant reliance on the blood evidence;[14] and (3) testimonial evidence that Mr. Muncey admitted to several people that he had killed his wife, claiming that it was an accident.  The Court found that although it was a close question, House had satisfied the gateway standard set out in *Schlup*, and that the lower court could disregard the procedural default and review the case on its merits.  __ U.S. at __, 126 S.Ct. at 2087.

Thus, Schlup had reliable post-conviction support from a videotape, two prison officials, and four black inmate eye witnesses in a racially motivated killing of a black inmate by a white man.  House had reliable support from recent scientific DNA evidence (which was unavailable at the time of House's trial) that effectively deprived the state of the forensic evidence lying at the heart of its case, and several witnesses to a confession by Mr. Muncey.  Petitioner here has an affidavit from a law enforcement officer that he was told by Bonifay that petitioner was unaware that a

[14]Specifically, House presented reliable evidence that the blood stains on his pants had not been properly prepared or stored by law enforcement, and that the blood on the pants most likely came from a spill when vials of Mrs. Muncey's blood were transported together with the pants to the FBI lab.  This would show that the blood was not splattered on House's pants during the murder.

crime was going to be committed, but according to petitioner, after five years of effort attempting to gain his cooperation, Bonifay is not willing either to confirm the contents of the affidavit, or to testify in his behalf.  Petitioner also has an affidavit from a juror who says that, *assuming Bonifay's statement to the deputy is true*, he would not convict petitioner.  The evidence proffered by petitioner comes nowhere near the evidence produced in *Schlup, supra*, and *House, supra*.  That is, even if Deputy Vieitez were allowed to testify at trial as to what Bonifay told him, this court cannot say that more likely than not, given the "overall, newly supplemented record[,]" *House*, 126 S.Ct. at 2078, <u>no</u> reasonable juror would have found him guilty beyond a reasonable doubt.

Finally, as stated by the *House* Court, "it bears repeating that the *Schlup* standard is demanding and permits review only in the extraordinary case."  ___ U.S. at ___, 126 S.Ct. at 2077 (internal citations and quotations omitted).  This is not such a case.  The court therefore concludes that petitioner has not made a threshold showing of actual innocence to avoid a statute of limitations bar to the consideration of his amended petition.

Accordingly, it is respectfully RECOMMENDED:

That the amended petition for writ of habeas corpus, (doc. 39) challenging the conviction and sentence in *State of Florida v. Larry E. Fordham, Jr.,* in the Circuit Court of Escambia County, Florida, case no. 91-606, be DISMISSED with prejudice and the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of January, 2007.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).